Randall A. Peterman, ISB No. 1944
Noah G. Hillen, ISB No. 7690
MOFFATT, THOMAS, BARRETT, ROCK &
    FIELDS, CHARTERED
101 S. Capitol Blvd., 10th Floor
Post Office Box 829
Boise, Idaho  83701
Telephone  (208) 345-2000
Facsimile  (208) 385-5384
rap@moffatt.com
ngh@moffatt.com
18794.0216

Attorneys for KeyBank National Association

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In Re:<br><br>HOLLIFIELD RANCHES, INC.,<br><br>    Debtor. | Case No. 10-41613-JDP<br>Chapter 11 |

### SUPPLEMENTAL OBJECTION TO DEBTOR'S MOTION FOR EMERGENCY USE AND CONTINUING USE OF CASH COLLATERAL

COMES NOW KeyBank National Association ("KeyBank") and files this Supplemental Objection of KeyBank to Debtor's Motion for Emergency Use and Continuing Use of Cash Collateral to the Motion for Emergency Use and Continuing Use of Cash Collateral (CR 5) ("CC Motion") filed by Hollifield Ranches, Inc. ("Debtor") in this matter.

The factual and procedural history of this case is set out in KeyBank's original cash collateral objections. (CR 62, 63, and 64). At issue are the financial and business practices of the Debtor, and three entities merged into the Debtor prepetition: Double H Cattle L.P. ("Double H"), White Gold Dairy, LLC ("White Gold"), and Hollifield Ranches, Inc. (Hollifield

SUPPLEMENTAL OBJECTION TO DEBTOR'S MOTION FOR EMERGENCY USE
AND CONTINUING USE OF CASH COLLATERAL - 1                         Client:1805715.1

Ranches". Double H is a feed lot operation, White Gold is a dairy operation, and Hollifield Ranches is a farming operation.

On October 13, 2010, KeyBank deposed Terry Hollifield (the "Deposition"), a shareholder and director of Debtor who runs Debtor's business operations. The additional objections detailed below came to light during the deposition. In light of all of the objections KeyBank has identified to Debtor's CC Motion, KeyBank requests that this Court: (1) deny the use of cash collateral to Double H; (2) permit a limited use of cash collateral by White Gold, only so as to prevent irreparable harm to the dairy operation; and (3) permit a limited use of cash collateral by Hollifield Ranches (the farming operation), so that the 2010 crops may be harvested, but do not permit cash collateral to fund the preparation and planting of the 2011 crops. KeyBank also requests special relief in the form of an additional cash collateral hearing, and an order requiring the Debtor to furnish certain information to KeyBank regarding the Debtor's financial operations prior to that hearing.

### I.  FACTUAL INFORMATION CONCERNING THE DEBTOR'S FINANCIAL CONDITION

1.  Immediately after Debtor filed for bankruptcy relief, KeyBank began working with the Debtor to obtain as much information as possible regarding the Debtor's financial condition. While the Debtor appeared willing to cooperate, numerous issues, questions and unfulfilled promises remain at issue:

- During a telephone conversation on September 14, 2010, Debtor agreed that within 30 days it would sell all remaining cattle held by Double H in which KeyBank holds a security interest. See Affidavit of Randall A. Peterman ("Peterman Aff.") at Ex. A (N. Hillen email dated September 14, 2010). During the Deposition, KeyBank learned that Debtor has yet to sell 138 head of cattle, which debtor values at more than $330,000.

- By electronic correspondence dated September 23, 2010, KeyBank requested that Debtor advise KeyBank regarding a seed lien purportedly held by Davidson and Company. *Id.* at Ex. B. Debtor has not provided any such information.

- By letter, dated September 27, 2010, Debtor agreed to provide KeyBank with consolidated financial statements for the consolidated entities that merged into Debtor prepetition. *Id.* at Ex. C (see issue 2 in B. Robinson letter dated September 27, 2010). Debtor has only provided financial statements for Double H, White Gold, and Hollifield Ranches.

- By letter, dated September 27, 2010, Debtor agreed to provide KeyBank with financial statements for Terry Hollifield. *Id.* at Ex. C (see issue 4 in B. Robinson letter dated September 27, 2010). Debtor has not provided the financial statements.

- By letter, dated September 27, 2010, Debtor agreed to provide KeyBank with financial statements for the entities D & H Farms and JT Livestock. *Id.* at Ex. C. Debtor has some interest in these entities, which such interests are property of the estate. KeyBank has also requested on numerous occasions that the Debtor advise as to the value and nature of these entities. Debtor has not provided the requested financial statements or information.

- By letter, dated September 17, 2010, and electronic correspondence dated October 4, 2010, KeyBank also has requested that Debtor provide a listing of all real properties owned by the Debtor and Terry Hollifield, including a valuation analysis and information regarding any lease of real property to the Debtor. *Id.* at Exs. D, E, and F. Debtor has not provided the requested analysis or copies of the leases involving the Debtor.

- By letter, dated September 17, 2010, and electronic correspondence dated October 4, 2010, KeyBank requested information about all of the Debtor's leases, both oral and written. *Id.* at Ex. D, E, and F.

- By electronic correspondence dated September 28, 2010 and October 4, 2010, KeyBank requested that Debtor provide all settlement reconciliations regarding the contract between the Double H and Tyson Fresh Meats, Inc. ("Tyson") *Id.* at Exs. F and G. Debtor has not provided all the reconciliations.

- By letters, dated September 17, 2010, and October 4, 2010, KeyBank has also requested that the Debtor advise KeyBank regarding the inheritance receivable from Terry Hollifield's parents, including the cash inheritance received and whether this was applied to the Debtor and real property

**SUPPLEMENTAL OBJECTION TO DEBTOR'S MOTION FOR EMERGENCY USE
AND CONTINUING USE OF CASH COLLATERAL - 3**                    Client:1805715.1

received and if this property is used by the Debtor. *Id.* at Ex. D, E, and F. Debtor has not done so.

- By correspondence dated September 17, 2010, and October 4, 2010, KeyBank has also inquired whether the Debtor intends to fulfill its fiduciary duty to creditors and collect on notes owed to the Debtor by JT Livestock and Hollifield Repair. *Id.* at Exs. D, E, and F. Debtor has provided no response.

- By correspondence dated September 17, 2010, and October 4, 2010, KeyBank has also requested that the Debtor provide a listing of the status of crops on hand held by the Debtor, including whether the crops were used as feed or sold to third parties. *Id.* at Exs. D, E, and F. The Debtor has not provided the requested information.

- KeyBank has also requested that the Debtor provide a report on all transfers between the entities merged into Debtor, including properly accounting for the transfer of cattle feed. *Id.* at Ex. D. (see issue 16 in B. Robinson letter dated September 27). The Debtor has not provided the requested information.

2.  KeyBank also requested the above documents and information at the Deposition, but the documents were still not provided.

3.  The Debtor has demonstrated a consistent lack of follow through in provided necessary and relevant information to KeyBank. KeyBank has many unanswered questions regarding the Debtor's business operations and need for cash collateral. Consequently, KeyBank is unable to adequately respond to the Debtor's request to use cash collateral.

4.  The Debtor has not yet filed a witness list, exhibit, list, or briefing, making it even more difficult for KeyBank, and the Court, to adequately prepare for the upcoming final hearing regarding the Debtor's use of cash collateral.

5.  The Debtor has not yet moved this court for an order approving the application of an accountant, despite the fact that the work product of Debtor's accountant is at issue and critical to cash collateral issues.

**SUPPLEMENTAL OBJECTION TO DEBTOR'S MOTION FOR EMERGENCY USE
AND CONTINUING USE OF CASH COLLATERAL - 4**

Client:1805715.1

6. The Debtor also did not file its schedules and statement of financial affairs until October 5, 2010. (CR 44) Those pleadings were due on September 24, 2010. (CR 15). This also has delayed KeyBank's attempts to effectively respond to the Debtor's request to utilize cash collateral.

7. This Court has ordered that the Debtor segregate cash collateral proceeds "into three (3) separate debtor-in-possession bank accounts (one for the dairy, one for the cattle, and one for the farm) in accordance with the requirements of 11 U.S.C. § 363(c)(4)." (CR 53 at p. 3). During the Deposition, however, Terry Hollifield stated that he intends to mix the cash collateral of each newly-merged entities, such that the cash collateral from one entity will be used to pay expenses of another entity. Not only does this tactic violate this Court's prior order, but constitutes a *de facto* substantive consolidation of the three merged entities, without compliance with the Bankruptcy Code, and will make further accounting for the entities impossible.

8. Hollifield Ranches apparently has at least 31 different real property lease agreements ("Leases"), wherein Hollifield Ranches is the lessee. Terry Hollifield testified during the Deposition that, in some cases, the lessor under these leases is Terry Hollifield; in others, the lessor is a third party. In some cases, the leases are oral; in others, the leases are in writing. Some leases are year-to-year; others extend over a period of time. Some leases are "back-loaded" with rent payments; others are not. Some may be assumed by the Debtor; some may not be. Despite KeyBank's repeated requests for copies of such Leases, they have not been provided by the Debtor. Until KeyBank can review all such Leases, this Court cannot allow use of cash collateral, on a lump sum basis exceeding $700,000, as requested by the Debtor, over the next four months.

9. Terry Hollifield also testified at the Deposition that the Debtor engages in the following hedging activities:

- Exhibit 206 demonstrates the existence of an R. J. O'Brien hedging account, with a balance of $97,596, in the name of Double H.

- Exhibit 208 demonstrates the existence of two hedging accounts in the name of White Gold.

- At the Deposition, Terry Hollifield testified that he intends to be "much more aggressive" post-petition in the hedging activities of the Debtor, apparently on the theory that he is now playing with house money. Terry Hollifield testified that he intends to increase such hedging activities as to both cattle and feed.

- Terry Hollifield, who is the sole shareholder, director and officer of the three merged Debtor entities, who has orchestrated the merger of those entities, and their joint Chapter 11 filing, may be entitled to engage in hedging activities in his capacity as an individual, which exposes *his own* assets to the hedging activity. He has the right to do so with cash collateral of the estate, and no amount of adequate protection can justify such use.

- Placing the assets of the estate at risk through hedging, without Bankruptcy Court approval, is not permissible. Hedging activities are a use, sale or lease of estate assets outside the ordinary course of business, which requires this Court's approval pursuant to 11 U.S.C. Section 363.

- Hedging activities constitute a loan from a third party to the Debtor outside the ordinary course of business, which is prohibited by 11 U.S.C. Section 364.

- Hedging activities may constitute executory contracts that require the Debtor to assume or reject such contracts pursuant to 11 U.S.C. Section 365.

- Hedging activities are not one of the enumerated "rights, powers and duties" of a Chapter 11 Debtor found in 11 U.S.C. Section 1107.

- Hedging activities expose the estate to abnormal risks of loss that are unnecessary to the operation of the Debtor's businesses in the ordinary course.

- The risk of loss resulting from the hedging activities is magnified by the merger of the three entities (Double H, Hollifield Ranches, and White

**SUPPLEMENTAL OBJECTION TO DEBTOR'S MOTION FOR EMERGENCY USE
AND CONTINUING USE OF CASH COLLATERAL - 6**

    Gold). After the merger, the combined assets of the formerly separate entities are now exposed to the hedging risks.

- The magnification of the risk of loss inherent in the hedging activity constitutes a *de facto* substantive consolidation of the three entities for bankruptcy purposes, without the protections of the Bankruptcy Code inherent in any such decision by the Bankruptcy Court.

- Losses generated by hedging activities could be granted administrative status that would need to be paid in cash and in full at confirmation, which could make confirmation of a plan impossible.

- The interest of KeyBank cannot be adequately protected due to the hedging activities because: (1) such hedging activities continues post-petition by the Debtor; (2) the hedging activities may expose the estate to unlimited losses; (3) the hedging activities expose the estate to an unlimited administrative priority claim against the estate based upon hedging losses; and (4) the stated intent of the Debtor to continue and even increase its hedging activities post-petition. KeyBank can only be adequately protected if the hedging activities are curtailed or terminated by order of this Court.

10.     The executory contract between Double H and Tyson has the following history:

- Prior to the petition date, Double H bought, fattened and sold cattle on its own behalf.

- Under the terms of its loans to Double H, KeyBank advanced funds to Double H for the operation of its cattle business.

- Under the terms of its loans to Double H, KeyBank held a floating first priority security interest in the Double H cattle and the proceeds of the Double H cattle.

- Under the terms of the loans to Double H, KeyBank received regular payments from Double H.

- Commencing in April of 2010, Double H changed its operation, such that Double H no longer bought, fattened and sold cattle on its own behalf. Instead, Double H entered into a contract with Tyson Fresh Meats, Inc. ("Tyson"), and terminated its business plan by which Double H bought, fattened and sold cattle on its own behalf.

**SUPPLEMENTAL OBJECTION TO DEBTOR'S MOTION FOR EMERGENCY USE
AND CONTINUING USE OF CASH COLLATERAL - 7**
                             Client:1805715.1

- Commencing in April of 2010, Double H entered into a contract with Tyson (the "Tyson Contract"). *See* Exhibit 218, a copy of which is attached as **Exhibit A** to CR 62. Under the terms of the Tyson Contract, Double H completely changed its business model.

- Pursuant to the Tyson Contract, Tyson and Double H agreed that *Double H "will procure feeder cattle . . . and provide feeding space" for 10,000 head of cattle per year.* (Tyson Contract, p. 1, "Procurement and Volume.") To KeyBank's best knowledge, information and belief, the Tyson Contract accounts for the entirety of the capacity of Double H.

- Tyson and Double H agreed that, "Double H . . . will feed and manage the cattle to an acceptable finished weight and provide them to [Tyson's] Pasco, WA Plan for slaughter during the term hereof." (*Id.*) KeyBank is unaware of the "acceptable finished weight" under the terms of the Tyson Contract.

- Tyson and Double H agreed that Double H would procure cattle for Tyson, and that Tyson would "reimburse Double H . . . for all purchase costs upon review and approve by appropriate [Tyson] management." (*Id.*, "Funding of Cattle.")

- Tyson and Double H agreed that *the cattle subject to the Tyson Contract would be sold at prices reflected in Tyson's "Northwest True Value Grid."* (*Id.*, p. 2, "Cattle Delivery and Market Value.") Despite KeyBank's efforts to obtain a copy of such document, the terms of the Grid are unknown to KeyBank. The Tyson Contract itself indicates that the "Northwest True Value Grid" price is less than market price.

- Tyson and Double H agreed that, "[Tyson] will be responsible for management of market risks through use of hedging practices on the cattle placed for feeding under this agreement. . . ," and that "The gain/loss resulting from this hedging activity will be included in settlement between Double H . . . and [Tyson] for each lot of cattle." (*Id.*, p. 2, "Risk Management.")

- Tyson and Double H agreed that if the hedging activity of Tyson resulted in a loss, that loss would be borne by Double H, not Tyson. (*Id.*, p. 3, Example #2.)

- Tyson and Double H agreed that all payments for cattle and feed, representing the overhead of Double H under the terms of the Tyson Contract, would initially be made by Double H, then reimbursed to Double H by Tyson, by an amount equal to the principal amount due, plus interest at LIBOR plus 4%. (*Id.*, p. 2, "Interest Costs.")

**SUPPLEMENTAL OBJECTION TO DEBTOR'S MOTION FOR EMERGENCY USE AND CONTINUING USE OF CASH COLLATERAL - 8**

Client:1805715.1

- Tyson and Double H agreed to a three-year term, with either party to the contract able to terminate it upon written notice. (*Id.*, p. 3.)

11. Tyson's hedging activities are different than the Debtor's hedging activities, since they are undertaken by Tyson, a non-debtor, that is a party to an executory contract with the Debtor. Nevertheless, these hedging activities expose the Debtor's estate to unlimited liability, for most of the same reason as identified above, all of which are hereby incorporated by reference.

12. This unlimited liability is only increased because of 11 U.S.C. Section 365. Under 11 U.S.C. Section 365, the executory contract between Tyson and the Debtor can be assumed only by the Debtor, who is granted the right to assume or reject the contract until the date of confirmation of the plan.

13. The interest of KeyBank cannot be adequately protected due to the hedging activities because: (1) such hedging activities continues post-petition by Tyson; (2) the hedging activities may expose the estate to unlimited losses; and (3) the hedging activities expose the estate to an unlimited administrative priority claim against the estate based upon hedging losses  KeyBank can only be adequately protected if the hedging activities are curtailed or terminated  by order of this Court.

## II. SUPPLEMENTAL OBJECTIONS RELATED TO DOUBLE H

14. During the Deposition, Terry Hollifield admitted that the cash collateral budget the Debtor submitted with the CC Motion is meaningless, and does not accurately represent the expenditures and income of the Debtor. For example, the budged attached to the CC motion for Double H indicates that Double H will generate $975,000 in income per month from "cattle sales," and expend $700,000 per month on "Cattle Purchases." (CR 5 at Ex. C).

**SUPPLEMENTAL OBJECTION TO DEBTOR'S MOTION FOR EMERGENCY USE
AND CONTINUING USE OF CASH COLLATERAL - 9**                    Client:1805715.1

Neither such representations are true under the Tyson Contract since Double H does not actually purchase and sell its own cattle. These purchases and expenditures are never actually made by Double H.

15. During the Deposition, Terry Hollifield indicated that Double H holds approximately $2.6 million in cash representing the proceeds of the sale of cattle in which KeyBank held a security interest. Accordingly, these funds are KeyBank's cash collateral. Terry Hollifield further testified that he intends to use $500,000 of this cash collateral as a "slush fund" to pay expenses related to Double H. Essentially, Double H intends to use KeyBank's cash collateral for expenses related to husbanding Tyson's cattle. The Tyson contract proscribes Double H from encumbering Tyson's cattle. Therefore, the Debtor proposes that KeyBank give up its security interest in $500,000 of its cash collateral, for the benefit of Tyson and the Debtor, with no adequate protection.

16. Terry Hollifield further testified at the Deposition that he intends to use the remaining $2.1 million in cash collateral, after subtracting the $500,000 "slush fund," to provide funding to Hollifield Ranches.[1] This violates the Court's prior order that cash collateral be segregated among the entities Double H, White Gold, and Hollifield Ranches. (CR 53).

17. Double H intends to use all equipment that it owns, which is subject to KeyBank's first perfected security interest, to perform the Tyson contract. The use of this equipment will result in depreciation, and thereby reduce the asset base for KeyBank's security interest. The Double H financial statements (Exhibit 206) shows that Double H owns $436,911

---

[1] KeyBank has also moved this Court for stay relief regarding the cash collateral held by Double H. CR 56.

worth of equipment. Debtor has made no offer of adequate protection for the use and depreciation of this equipment.

18. Double H has not sold the remaining 138 cattle in which KeyBank holds a security interest, as originally agreed. *See* Exhibit 206. During a telephone conversation on September 14, 2010, Debtor agreed that within 30 days it would sell all remaining cattle held by Double H in which KeyBank holds a security interest. Those cattle have not yet been sold.

19. Double H is unable to offer any type of replacement lien in the Tyson cattle that provides adequate protection to KeyBank as to the cash collateral, the 138 head of cattle, or the equipment. Double H does not own the Tyson cattle, and the Tyson Contract prohibits Double H from granting any security interest in the Tyson cattle. *See* Exhibit 218.

20. The hedging activities by Debtor detailed above also place an unlimited risk of loss on the estate and may also prevent confirmation of any plan.

21. Likewise, the hedging activities by Tyson detailed above also expose the Debtor's estate to unlimited liability.

22. The Debtor's actions through Double H breach any and all fiduciary duties that the Debtor owes to the estate and creditors.

23. Accordingly, this Court should not permit Double H to use any cash collateral.

### III. SUPPLEMENTAL OBJECTIONS RELATED TO WHITE GOLD

24. Terry Hollifield testified during the Deposition that at least 80% of the feed purchased by White Gold Dairy is provided by Hollifield Ranches. According to the White Gold cash collateral budget, this amounts to $275,000 per month. However, and according to the deposition, White Gold has not for the past two years paid Hollifield Ranches a single penny for

SUPPLEMENTAL OBJECTION TO DEBTOR'S MOTION FOR EMERGENCY USE
AND CONTINUING USE OF CASH COLLATERAL - 11                              Client:1805715.1

this feed. Instead, White Gold creates an accounting entry entitled "account payable" to Hollifield Ranches, but neither seeks nor obtains such payment. By virtue of this accounting irregularity and according to Debtor's own Exhibit 208, the "account payable" for feed owed by White Gold Dairy to Hollifield Ranches has ballooned to $3,550,581. This accounting irregularity also means that White Gold's cash flow for the past two years is overstated by almost $3.6 million. In other words, if White Gold's purchase of feed from Hollifield Ranches had been paid in cash (as it would have been with any other vender), White Gold's financial condition would be severely worsened, and White Gold would presently generate no cash flow, and operate at a deficit.

25. Finally, the books and records of White Gold Dairy and Hollifield Ranches do not even reflect correlative entries regarding the feed issue. The White Gold Dairy financial statement (Exhibit 208) shows an account payable due from Hollifield Ranches of almost $3.6 million; yet the Hollifield Ranches financial Statement (Exhibit 207) shows an account receivable due from White Gold Dairy of only $829,597.

26. This analysis reveals several conclusions: First, *White Gold has assets that are far exceeded by its liabilities*. Second, *White Gold cannot generate positive cash flow*. Third, *White Gold can exist in an economic sense only by the subsidies it receives from its sister corporations, Hollifield Ranches and Double H Cattle*. White Gold survives at the financial expense of its sister corporations. Fourth, and most importantly, *such subsidies could not occur but for the questionable accounting practices of all three entities*.

27. Terry Hollifield also testified at the Deposition that White Gold owns two hedging accounts, and that he intends to be "much more aggressive" post-petition in the hedging activities of White Gold, apparently on the theory that that he is now playing with house money.

**SUPPLEMENTAL OBJECTION TO DEBTOR'S MOTION FOR EMERGENCY USE AND CONTINUING USE OF CASH COLLATERAL - 12**

Client:1805715.1

As discussed above, placing the assets of the estate at risk through hedging, without Bankruptcy Court approval, however, is not permissible.

28. Hedging activities are a use, sale or lease of estate assets outside the ordinary course of business, which requires this Court's approval pursuant to 11 U.S.C. Section 363. Hedging activities constitute a loan from a third party to the Debtor outside the ordinary course of business, which is prohibited by 11 U.S.C. Section 364.

29. Hedging activities may constitute executory contracts that require the Debtor to assume or reject such contracts pursuant to 11 U.S.C. Section 365.

30. Hedging activities are not one of the enumerated "rights, powers and duties" of a Chapter 11 Debtor found in 11 U.S.C. Section 1107.

31. Hedging activities expose the estate to abnormal risks of loss that are unnecessary to the operation of the Debtor's businesses in the ordinary course. The risk of loss resulting from the hedging activities is magnified by the merger of the three entities (Double H, Hollifield Ranches, and White Gold).

32. After the merger, the combined assets of the formerly separate entities are now exposed to the hedging risks.

33. The magnification of the risk of loss inherent in the hedging activity constitutes a *de facto* substantive consolidation of the three entities for bankruptcy purposes, without the protections of the Bankruptcy Code inherent in any such decision by the Bankruptcy Court.

34. Losses generated by hedging activities might be granted administrative status that would need to be paid in cash and in full at confirmation, which could make confirmation of a plan impossible.

**SUPPLEMENTAL OBJECTION TO DEBTOR'S MOTION FOR EMERGENCY USE
AND CONTINUING USE OF CASH COLLATERAL - 13**

Client:1805715.1

35. The interest of KeyBank cannot be adequately protected due to the hedging activities because: (1) such hedging activities continues post-petition by the Debtor; (2) the hedging activities may expose the estate to unlimited losses; (3) the hedging activities expose the estate to an unlimited administrative priority claim against the estate based upon hedging losses; and (4) the stated intent of the Debtor to continue and even increase its hedging activities post-petition. KeyBank can only be adequately protected if the hedging activities are curtailed or terminated by order of this Court.

36. Finally, the lack of an annualized cash collateral budget for a dairy farm is fatal. Debtor has only provided a budget running through December 2010. During his deposition, Terry Hollifield testified that the Debtor's operations changed by season, and that an annualized financial statement would most accurately state the financial condition of the Debtor. Until such annualized cash collateral budget is provided by the Debtor, the operation of White Gold should simply be maintained at a "status quo" basis, with no additional cattle being purchased, and with all ongoing purchases of feed or other expense items being paid on a cash basis. Otherwise this Court is rewarding this Debtor entity for ongoing misstatements reflected in the financial statements of Double H, White Gold, and Hollifield Ranches.

37. Debtor's above actions breach any and all fiduciary duties that the Debtor owes to the estate and creditors. Accordingly, this Court should only permit the use of cash collateral by White Gold, so as only to husband the cattle and prevent irreparable harm to the dairy operation. White Gold should not be permitted to purchase additional dairy cows, and should only be permitted to maintain its current operation.

### IV. SUPPLEMENTAL OBJECTIONS RELATED TO HOLLIFIELD RANCHES

38. Because of the accounting irregularities practiced by White Gold, Hollifield Ranches has *missed* almost $3.6 million in cash flow over the past three years. In other words, the combined effect of the accounting irregularities practiced by White Gold and Hollifield Ranches has resulted in the financial condition (and especially cash flow position) of White Gold Dairy is materially *worse* than stated in the financial statements, while the financial condition (and especially cash flow position) of Hollifield Ranches is much *better* than stated.

39. Terry Hollifield testified during the Deposition that the total cost to operate Hollifield Ranches is approximately $4 million per year. He also stated that the total amount of income generated by Hollifield Ranches was approximately the same amount--$4 million. Nevertheless, Terry Hollifield testified that he intends to transfer over $2 million of the cash collateral held by *Double H* to Hollifield Ranches, so as to meet the cash flow requirements of Hollifield Ranches.

40. The financial statements for Hollifield Ranches indicates the lack of veracity in this statement regarding Hollifield Ranches cash flow requirements. According to that financial statement, Hollifield Ranches can fund the 2011 crop year through the following sources:

- Un-deposited funds (i.e., 2009-10 crop proceeds): - $557,793
- Funds from 2009-10 crop:     $2,330,778
- Accounts receivable:     $1,216,363
- Keegan potatoes:     $600,000
- Double H Cattle:     $74,200
- Terry Hollifield:     $189,200

**SUPPLEMENTAL OBJECTION TO DEBTOR'S MOTION FOR EMERGENCY USE
AND CONTINUING USE OF CASH COLLATERAL - 15**

Client:1805715.1

**Total:** $4,410,541

41. By the very financial statements prepared by Hollifield Ranches, there is absolutely no need for a "cross over" of Double H cash collateral to fund the operations of Hollifield Ranches. Furthermore, if White Gold would simply pay Hollifield Ranches on a timely basis for feed that Hollifield Ranches *gifts* to White Gold Dairy, then Hollifield Ranches would have an additional $3 million in cash to funds its operations.

42. Hollifield Ranches apparently has at least 31 different Leases, wherein Hollifield Ranches is the lessee. Terry Hollifield testified during the Deposition that, in some cases, the lessor under these leases is Terry Hollifield; in others, the lessor is a third party. In some cases, the leases are oral; in others, the leases are in writing. Some leases are year-to-year; others extend over a period of time. Some leases are "back-loaded" with rent payments; others are not. Some may be assumed by the Debtor; some may not be. Despite KeyBank's repeated requests for copies of such leases, they have not been provided by the Debtor. Until KeyBank can review all such leases, this Court cannot allow use of cash collateral, on a lump sum basis exceeding $700,000, as requested by the Debtor, over the next four months.

43. The lack of an annualized cash collateral budget is especially fatal to the operation of a seasonal farming debtor. Unless and until an annualized cash collateral budget is provided, this Court should not allow any use of cash collateral other than to harvest existing crops. Under no circumstances should cash collateral use be allowed on this record, for 2011 crop preparation activities.

## V.   CONCLUSION

44. Because each of the Debtor entities misstate their true financial condition in their financial statements, none of those statements are credible. Without credible financial

data, this Court cannot authorize the use of the cash collateral. Therefore, this Court should (1) deny the use of cash collateral to Double H; (2) permit a limited use of cash collateral by White Gold, so as only to prevent irreparable harm to the dairy operation; and (3) permit a limited use of cash collateral by Hollifield Ranches (the farming operation), so that the 2010 crops may be harvested, but do not permit cash collateral to fund the preparation and planting of the 2011 crops.

45. White Gold also requests special relief in the form of an additional cash collateral hearing, and an order requiring the Debtor to furnish certain information to KeyBank regarding the Debtor's financial operations prior to that hearing. The information KeyBank requests is vital to understanding the operations of the Debtor. The need for this information is heightened by the financial statements that misstate the Debtor's financial condition, and the misleading CC Budget submitted to this Court.

46. At least two weeks prior to such hearing, the Debtor should be required to furnish the following information to KeyBank:

- Information regarding the status of sale of certain cows in which KeyBank holds a security interest.

- Status of resolution of issues with possible typographical error on Double H financial statement. (Schedule F of the Double H Cattle financial statement identifies an accounts payable to White Gold Dairy for cattle purchases in the amount of $156,880. Schedule A of the White Gold Dairy financial statement identifies an accounts receivable from Double H Cattle for livestock sold in the amount of $156,890).

- Consolidated financial statement as of September 10, 2010, for all of the consolidated entities.

- Financial statement for TGH Farms as of September 10, 2010.

- Financial statements for D & H Farms and JT Livestock.

- Information regarding real properties owned by the Debtor or Terry Hollifield, including valuation analysis, information regarding leases.

- Settlement reconciliations regarding the contract between Debtor and Tyson since the date of the execution of the Tyson contract, including information as to the grid pricing the system used by Tyson to value the cattle.

- Information regarding Davidson and Company seed lien.

- Information and clarification regarding the entities D & H Farms and JT Livestock, including valuations and explanations of the nature of the entities.

- Information and documentation regarding the inheritance receivable from the deceased parents of Terry Hollifield, including cash received and use thereof, including the use of both by the Debtor.

- Information regarding the intention of the Debtor as to its fiduciary duty to collect on notes from the entities JT Livestock and Hollifield Repair.

- Information regarding crops on hand and whether such crops were used as feed or sold to third parties.

- Real property deeds showing transfers of real properties as alleged in B. Robinson's letter dated September 27, 2010.

- Accurate reports documenting all intercompany transfers of cash, crops, and cattle feed.

- Annualized cash collateral budgets for Double H, White Gold, and Hollifield Ranches.

DATED this 15th day of October, 2010.

MOFFATT, THOMAS, BARRETT, ROCK & FIELDS, CHARTERED

By /s/ Randall A. Peterman
Randall A. Peterman – Of the Firm
Attorneys for KeyBank National Association

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 15th day of October, 2010, I filed the foregoing **SUPPLEMENTAL OBJECTION TO DEBTOR'S MOTION FOR EMERGENCY USE AND CONTINUING USE OF CASH COLLATERAL** electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

**Brent T. Robinson**
btr@idlawfirm.com
*Attorneys for Debtor*

**Craig W. Christensen**
cwcc@ida.net
*Attorneys for J.R. Simplot*

**David F. Shirley**
dshirley@pmt.org
*Attorneys for Western Seeds*

**William R. Hollifield**
bhollifield@idalawyer.com
*Attorneys for Creditor C.W. Hollifield Estate*

**Scott Tschirgi**
sat@satchartered.com
*Attorney for Pioneer Commodities, LLC*

**Mary P. Kimmel**
ustp.region18.bs.ecf@usdoj.gov

**United States Trustee**
ustp.region18.bs.ecf@usdoj.gov

**John S. Ritchie**
crrtflaw@msn.com
*Attorneys for Eagle Creek Northwest LLC*

**David A. Heida**
dheida@capitollawgroup.net
*Attorneys for Wilbur-Ellis Company*

**Daniel C. Green**
dan@racinelaw.net
*Attorneys for Thomas Petroleum, LLC d/b/a Bowen Petroleum, Inc.*

**Robert J. Maynes**
mayneslaw@hotmail.com
*Attorney for ADM Edible Bean Specialties, Inc.*

**John O. Fitzgerald II**
jof@magicvalleylaw.com
*Attorneys for Agri-Stor Company, Inc./Chemical Supply Co., Inc.; OK Auto Systems, Inc.; and Robert Harris*

**David W. Gadd**
dwg@magicvalleylaw.com
*Attorneys for Agri-Stor Company, Inc./Chemical Supply Co., Inc.; OK Auto Systems, Inc.; and Robert Harris*

**J. Justin May**
jmay@may-law.com
*Attorneys for Wilbourn Garage Doors*

**SUPPLEMENTAL OBJECTION TO DEBTOR'S MOTION FOR EMERGENCY USE AND CONTINUING USE OF CASH COLLATERAL - 19**

Client:1805715.1

**David A. Coleman**
davidcoleman@msn.com
*Attorneys for John Coleman dba A & J Farm
and Lasko Alexander Farm, L.L.C.*

AND, I FURTHER CERTIFY that on such date I served the foregoing **SUPPLEMENTAL OBJECTION TO DEBTOR'S MOTION FOR EMERGENCY USE AND CONTINUING USE OF CASH COLLATERAL** on the following non-CM/ECF Registered Participants in the manner indicated:

| | |
|---|---|
| Hollifield Ranches, Inc.<br>4076 E. 3400 N.<br>Hansen, ID  83334 | (X) U.S. Mail, Postage Prepaid<br>( ) Hand Delivered<br>( ) Overnight Mail<br>( ) Facsimile |
| Hollifield Ranches, Inc.<br>22866 US Highway 30<br>Hansen, ID 83334 | (X) U.S. Mail, Postage Prepaid<br>( ) Hand Delivered<br>( ) Overnight Mail<br>( ) Facsimile |
| John O. Fitzgerald II<br>David W. Gadd<br>WORST FITZGERALD & STOVER, PLLC<br>746 N. College Rd., Suite C<br>P.O. Box 5226<br>Twin Falls, ID  83303-5226<br>*Attorneys for Agri-Stor Company, Inc./Chemical Supply Co., Inc.; OK Auto Systems, Inc.; and Robert Harris* | (X) U.S. Mail, Postage Prepaid<br>( ) Hand Delivered<br>( ) Overnight Mail<br>( ) Facsimile |
| Tyson Fresh Meats, Inc.<br>2200 Don Tyson Parkway CP131<br>Springdale, AR 72762 | (X) U.S. Mail, Postage Prepaid<br>( ) Hand Delivered<br>( ) Overnight Mail<br>( ) Facsimile |

_____
Randall A. Peterman